(No. 48066.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. WILLIAM TENNANT, Appellant.

*Opinion filed November 15, 1976.*

James J. Doherty, Public Defender, of Chicago (Judith A. Stewart and John Thomas Moran, Assistant Public Defenders, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel and Jayne A. Carr, Assistant Attorneys General, of Chicago, and Laurence J. Bolon and Eugene J. Rudnik, Jr., Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant, William Tennant, was convicted of murder in a jury trial and sentenced to a term of 15 to 30 years imprisonment. A divided First District Appellate Court affirmed (32 Ill. App. 3d 1034), and we allowed leave to appeal.

Officer Eugene Earl of the Chicago police department testified that he and his partner received a radio call at about 5 a.m., August 2, 1972, concerning a "battery victim." They went to a third-floor apartment address, knocked on the door, received no response and left. At about 5:45 a.m., another call was received directing them to the same address. The radio dispatcher had given the name Tennant as the caller on both occasions. This time

they were admitted by Herbert Cross, a blind tenant. The large apartment on the third floor consisted of four sleeping rooms for separate tenants, and a common kitchen and bathroom. Testimony of several witnesses established that Willa Watson and her "husband," Harry Housely, lived in the front of the apartment, Cross in a room directly across from the entrance, Peter Reeves in a room toward the rear of the apartment, and defendant in another room at the rear.

The officer testified that, shortly after he entered, he looked through the open doorway into defendant's room and saw the body of a man, later identified as Eugene Johnson, lying face up in the middle of a bed. Closer examination with a flashlight revealed that the man had sustained massive injuries to his face and skull. Blood had spattered onto the bed and wall, and there were pieces of flesh and bone on the bed. The parties stipulated that the skull fracture caused death.

After the officer discovered Johnson's body he awakened Watson and Housely. Watson answered the door to their room in a nightgown and identified the deceased. As the officer talked with Watson defendant entered the apartment, and the officer noticed several red spots on his shirt and trousers. He immediately placed defendant under arrest and informed him of his rights. The officer testified that defendant told him he had gone to his sister's apartment earlier that night; that when he returned home he lay down on his bed with Johnson, then nudged him to ask for money for some wine; that when Johnson failed to answer, defendant looked more closely at him and discovered his condition; and that he then got up, left the apartment, and called the police. Defendant, the officer said, also told him that no one responded to his first call, so he called again.

The officer requested defendant to remove his outer clothing, which was later sent to the crime laboratory. At about this time, Reeves came from his room and asked

what was "going on." The officer looked into Reeves' room and saw a 3 foot 5 inch piece of angle iron leaning against the door of a refrigerator. The angle iron, with a dry reddish stain on one end, was pointed out by the officer to crime laboratory technicians who had arrived. They dusted it but found no fingerprints.

Officer Earl further testified that he examined other areas of the apartment. He found a few drops of "red substance" on the floor some 3 to 5 feet inside Watson's room. In the bathroom he discovered a "blood-type" substance in the basin, a dress soaking in the bathtub in water that had a reddish tint, and a small bucket in the bathtub containing similarly tinted water. Watson told the officer she had received a head wound earlier in the week which had stained her dress with blood. Earl stated that he noticed a 3 to 4 inch bandage on her head. The officer testified also that he checked the various doors in the apartment and that, with the exception of the front door to the apartment itself, none of the doors to the sleeping rooms could be locked. Other testimony established that the rear door to the apartment also could not be locked.

Over defendant's objection, the trial court permitted counsel for the State to read to the jury a transcript of Willa Watson's testimony given August 17, 1972, at defendant's preliminary hearing. Watson had testified for the State and had been cross-examined by counsel for defendant without limitation. The parties stipulated that Watson had died on January 3, 1973, prior to trial.

Her testimony was that she had known defendant for 6 years, and Johnson for 6 months. She, defendant, and Johnson had been together on the back porch of the apartment in the early morning hours of August 2, 1972. Other testimony showed they were drinking wine with several other people. Johnson left the group about 2:30 a.m., saying he was going to take a nap. Watson went to bed around 3 a.m. and saw Johnson sleeping in defendant's bed as she walked past the room. She did not know where

defendant was at that time. Although she could not estimate the time, she testified that she was awakened later when defendant knocked on her door and entered to get some clothes she kept for him. Defendant left carrying his clothes and a metal bar. Watson identified the bar as a bed railing that had been cut off. She owned the bed railing and used it to hold the broken door of her refrigerator closed.

After defendant left, Watson testified, she heard him say "Get out of my bed ***" with the addition of an obscenity. She heard no sounds of a struggle. Later defendant reentered her room and threw the "iron pipe" either on her bed or on the floor by her bed. Watson also testified that defendant returned a third time to retrieve the piece of metal from her room, but on cross-examination she stated she had not actually seen him on that occasion because she was asleep. She concluded, however, that "he must have" returned.

Two homicide investigators from the police department also came to the apartment that morning, one of whom testified at trial. After examining the apartment, they returned to the police station where they first took statements from Watson and Reeves. At about 10 a.m. they interviewed defendant, after he had said, in response to their warning, that he understood his legal rights. The investigator testified that defendant made an oral statement about being at his sister's house and discovering Johnson's body upon returning to his apartment early that morning. The statement was quite similar to the one given by defendant to the arresting officer.

The investigator further stated that defendant left the interview room briefly to get some water. When he returned, the investigator told him that he knew defendant had been at the apartment all evening drinking with the other tenants. Defendant then said he would tell the truth, and stated that he beat Johnson with the angle iron because the deceased was "picking on him," and that he

killed him because "I was tired of being ------ with." Defendant also agreed to repeat his statement to an assistant State's Attorney. The entire conversation with the investigator took 10 or 15 minutes.

Marshall Weinberg, then an assistant State's Attorney, was called to the station by the police. He was in private practice at the time of trial and testified that he had introduced himself to defendant at the police station and advised him of his constitutional rights. Defendant then told him he had struck and killed Johnson with an iron bar because he had taken defendant's food stamps and other things. When Weinberg suggested that a court reporter be brought in to put the statement in writing, defendant said he would not sign anything until he had talked to an attorney. Attorney Weinberg then stopped the examination and prepared a written memorandum of his 10-minute conversation with defendant, which was typed 2 days later. The typed memorandum was not admitted as a trial exhibit.

The defense called Louis Vitullo, a microanalyst for the Chicago police department crime laboratory, to testify as to the results of his examination of various items of physical evidence. The parties stipulated that Johnson had type O blood. Vitullo determined that the blood on the bed where Johnson was found was also type O. The examination of the reddish brown stains on defendant's shirt and trousers revealed that all were human blood, but only one was identifiable; located near the shirt collar it was type O. The tests on the angle iron showed the presence of human blood but were inconclusive as to type. Vitullo did not find any particles of flesh, bone or hair on the angle iron. Tests on the substance found on the floor of Watson's apartment confirmed the presence of blood, but it could not be determined whether the blood was of human origin. Vitullo also examined fluid from the bucket in the bathroom, which tested negatively for blood. Watson's dress, which had been soaking in the bathtub,

was not submitted to the crime laboratory for analysis.

Defendant's niece, Barbara Hunter, age 17, testified that defendant visited the apartment where she lived with her aunt about midnight on August 1. She stated that defendant spoke briefly with her and her aunt and later fell asleep because he had been drinking. When defendant left, at about 4 a.m., she said she was watching Channel 9 television, which she continued to watch until 6 a.m. or so. The parties stipulated that this television station "signed off" that morning at 3:10 a.m. plus 30 seconds. The aunt of this witness was hospitalized at the time of trial and did not testify.

Defendant testified on his own behalf that on August 1 he spent the day working with the janitor of the apartment building until about 8 p.m. He took a break about 7 o'clock and drank wine with some people on the back porch. Around 8 o'clock he went next door to an apartment and drank with some friends until 11 or 11:30 at night. Thereafter he walked to his sister's house, arriving about midnight. He fell asleep there and left when he awoke. He did not notice the time. As defendant walked home, however, he noticed a clock in a store window which showed 4:15 a.m.

Defendant testified further that upon arriving at his apartment he lay down in his bed next to Johnson. He testified that it was not unusual for Johnson to spend the night with him; he had slept there several times before. Defendant tried to wake Johnson but could not see him well because of the absence of his glasses and because the switch to his room light was broken. The parties stipulated that defendant had glaucoma and that the lens of his left eye was gone. The sight of this eye was poor, and even with glasses the vision of his right eye was 20/60. The parties also stipulated that on August 2 defendant's glasses were being repaired. Defendant testified that he then opened the refrigerator door for some light, and leaned over close to Johnson's face, which seemed "wet." He

knocked on Watson's door, reported what he had discovered, and then called the police, first from a pay telephone outside and next from a neighbor's phone. When the police arrived he returned to his apartment where he was arrested. Defendant testified that before noon on August 1 he had helped Watson close her refrigerator door with the angle iron, but had not seen it afterward until it was discovered by the police in Reeves' room.

Defendant testified that he had spoken with police officers and with the assistant State's Attorney but denied having told anyone that he had struck or killed Johnson. He stated that he was given a piece of paper to sign but could not read it without his glasses. After it was read to him he refused to sign it because it was not what he had said.

Defendant's major argument is that the State's use at trial of Watson's preliminary hearing testimony denied him due process of law and the right under the Federal and State constitutions to confront witnesses against him. Applied to the States in *Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065, the sixth amendment to the Federal Constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him" (U.S. Const., amend. VI). The comparable Illinois provision reads: "In criminal prosecutions, the accused shall have the right *** to meet the witnesses face to face" (Ill. Const. 1970, art. I, sec. 8). Despite the language difference, the two clauses are meant to protect the same interest. Dean Wigmore has written, "The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*" (5 Wigmore, Evidence, sec. 1395 (Chadbourn rev. ed. 1974) (emphasis in original).) In *Mattox v. United States* (1895), 156 U.S. 237, 242-43, 39 L. Ed. 409, 411, 15 S. Ct. 337, 339, the Supreme Court described the confrontation clause thus:

"The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

Wigmore observes that the advantage obtained by the personal appearance of the witness at trial is secondary, however, and "is a result accidentally associated with the process of confrontation." (5 Wigmore, Evidence, sec. 1395 (Chadbourn rev. ed. 1974).) It has never been thought that the absence of a witness absolutely bars the use of earlier testimony. In *Mattox,* for example, the court held admissible at a second trial a transcript of testimony, under both direct and cross-examination, given at the former trial where the witness died in the intervening period.

In Jones On Evidence, the rule is stated as:

"It is generally recognized that where the defendant has had the right to cross-examine a witness at a previous trial (or at the preliminary hearing) and the witness has become unavailable to testify at the trial, the testimony of the witness given on the previous occasion is admissible against the accused, as there had been a prior opportunity of confrontation." 2 Jones, Evidence, sec. 6:41 (6th ed. 1972).

In this State the admissibility at trial of preliminary hearing testimony of a witness who died prior to trial was considered in *Barnett v. People* (1870), 54 Ill. 325. This court there held a witness who heard and remembered decedent's testimony at the preliminary hearing could

testify thereto at the later murder trial of decedent's assailant. In so holding the court stated: "Nor does the supposed constitutional objection arise to such evidence, as the witness was confronted with the accused, and he was afforded an opportunity of cross examination in the examining court." (54 Ill. at 330.) While there are no cases in the United States Supreme Court specifically holding that preliminary hearing testimony of a witness since deceased is automatically admissible at trial so long as the witness was cross-examined, there is persuasive language in several opinions. In *Mattox,* which cited *Barnett,* in considering the admissibility of former trial testimony, the court said the authority in favor of admitting former testimony "where the defendant was present either at the examination of the deceased witness before a committing magistrate, or upon a former trial of the same case, is overwhelming." (156 U.S. 237, 241, 39 L. Ed. 409, 410, 15 S. Ct. 337.) Subsequently, in *Motes v. United States* (1900), 178 U.S. 458, 472, 44 L. Ed. 1150, 1155, 20 S. Ct. 993, that court, while there denying admissibility because the unavailability of the witness was directly due to the government's negligence, cited with approval a treatise stating that testimony before an examining magistrate would be admissible at trial if there had been an opportunity to cross-examine and the witness was unavailable.

Statements in the later cases of *Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065, *Barber v. Page* (1968), 390 U.S. 719, 20 L. Ed. 2d 255, 88 S. Ct. 1318, and *California v. Green* (1970), 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930, all, in our judgment, confirm the earlier holding of *Mattox* that previous testimony of a witness who dies pending trial is admissible at that trial if an adequate opportunity for cross-examination was present when the testimony was originally given.

Defendant argues that the differences between the purposes of a preliminary hearing and those of a trial,

coupled with the unavailability of discovery prior to preliminary hearing, preclude admitting testimony given at a preliminary hearing regardless of whether testimony at an earlier trial would have been admissible. Although the Supreme Court in *Barber* did discuss the differences between the two proceedings, its holding was bottomed upon the inadequacy of the State's efforts to secure the attendance of the witness, and the court further stated: "there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demands of the confrontation clause where the witness is shown to be actually unavailable." 390 U.S. 719, 725-26, 20 L. Ed. 2d 255, 260, 88 S. Ct. 1318, 1322. That such justification existed was subsequently made clear in *Green*.

Defendant also suggests that we should require the trial court to conduct an *in camera* inspection to determine the reliability of any preliminary hearing testimony sought to be introduced at trial, especially where that testimony is uncorroborated by other witnesses. We do not agree. First, in no case we have discovered has corroboration been thought to be an element of the right of confrontation. Second, an *in camera* inspection is unnecessary, in our judgment, because an adequate opportunity for cross-examination itself provides enough evidence of reliability to allow the testimony to go to the jury. In Dean Wigmore's view, "if the accused has had the benefit of cross-examination, he has had the very privilege secured to him by the Constitution" (5 Wigmore, Evidence, sec. 1397, at 158 (Chadbourn rev. ed. 1974)), and it becomes necessary to inquire into reliability only in the absence of cross-examination.

We accordingly hold that where, as here, there was an adequate opportunity for cross-examination of the preliminary hearing testimony of a witness who dies prior to trial, the earlier testimony of that witness is properly admitted at trial. See also *People v. Horton* (1976),

65 Ill. 2d 413.

Defendant also contends he was not proved guilty beyond a reasonable doubt. He argues that Watson's preliminary hearing testimony was incomplete, inconsistent, and uncorroborated, that the physical evidence connecting him to the crime was inconclusive, and that his alibi was unrefuted. He also denies having confessed to the killing. The appellate court considered these issues in detail (32 Ill. App. 3d 1034, 1041-45) and concluded that the guilty verdict was amply supported by the evidence. We agree and need make only a few observations. Defendant's contention is severely undermined by the testimony of the police investigator and the former assistant State's Attorney that defendant confessed to the killing. The jury was free to choose between their testimony and his denial. Also, defendant's trial counsel pointed out at length to the jury in closing argument the inconsistencies in Watson's earlier testimony and what he considered to be the State's inability to corroborate her. Too, the jury had no obligation to believe defendant's alibi evidence (*People v. Brown* (1972), 52 Ill.2d 94, 105-06), and, even if they did, defendant's own testimony places him back at his apartment around 4:30 a.m., with sufficient time to commit the murder and call the police by 5 o'clock. With respect to the physical evidence, we agree that much of it is inconclusive. There was, though, a physical link established by the presence of type O blood on defendant's shirt collar. Finally, "[t]he determination of the jury will not be disturbed unless the evidence is so unsatisfactory as to justify a reasonable doubt of guilt." (*People v. Benedik* (1974), 56 Ill.2d 306, 310.) This is not such a case.

The judgment of the appellate court is accordingly affirmed.

*Judgment affirmed.*