THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD E. JOHNSON, Defendant-Appellant.

Fifth District   No. 5—84—0782

Opinion filed July 16, 1986.

HARRISON, J., dissenting.
KARNS, J., concurring in part and dissenting in part.

Randy E. Blue and Dan W. Evers, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle, Stephen E. Norris, and Susan M. Young, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WELCH delivered the judgment of the court:

A St. Clair County grand jury returned a bill of indictment charging defendant, Edward Johnson, with aggravated indecent liberties with a child. (Ill. Rev. Stat. 1983, ch. 38, par. 11—4.1.) A jury found defendant guilty as charged, and he appeals. The issues concern the

complaining witness, five-year-old Danielle Willis, defendant's step-daughter, and seven-year-old Michael Willis, Danielle's brother, whose testimony was recorded on videotape for presentation to the jury; also defendant was not present in the room in which the complaining witness testified.

The indictment in question occurred June 26, 1984. Joyce Willis, the mother of Danielle and Michael and the wife of the defendant, testified at trial as follows. She left the family's apartment at 6:45 that morning. Danielle, Michael and their younger brother Averil were still asleep in their bedroom. Defendant slept in the bedroom-living room, but woke to lock the apartment door behind her when she left. She returned between 9:30 and 9:45 a.m. She knocked on the door; defendant asked who it was; she told him; he opened the door and asked what to do about bleeding. Danielle was sitting on the toilet, and the bowl was "full of blood." She asked Danielle who did this, and she said "it was man." Mrs. Johnson asked Danielle if she would know this man if she saw him again, whether she knew what he looked like, and whether she knew his name. Danielle answered yes each time. Defendant told Mrs. Johnson he was asleep and when he awoke he heard Danielle sniffing and crying; he found her sitting on the toilet. Mrs. Johnson started for the back door, thinking the "man" might be either the upstairs neighbor (Robert Lewis) or the neighbor boy (Emmanuel Wilson, whose nickname was "Man"). Defendant stopped her, but not before she noticed the back door (leading to a common storage room) was unlocked; she had checked that lock before leaving the apartment. Defendant and Mrs. Johnson took Danielle to a hospital by taxi. Danielle later told her defendant "put his ding ding in me" and put water and tissue in her. The latter conversation occurred "a good while" later, because (said Mrs. Johnson) "I said I am not going to talk to her about it too much. So, when I finally did talk to her, she was sitting off by herself and I asked her what was wrong. I asked her what was she thinking about and she said, 'I was thinking about that man.' I said, what was that man's name, and she said Edward. I said, 'What did Edward do to my baby?' She said, 'He hurt me.' I said, 'How did he hurt you?' And she said, 'He put tissue in me, and he put water in me, and he put his ding ding in me.'" On cross-examination, Mrs. Johnson testified: "I didn't ask her too many times. The only time I would ask her is if I found her sitting off to herself and she would be like off in a daze and I would ask her what was wrong." According to Mrs. Johnson: "When I first started questioning her about it, all she would do is start shaking and crying."

Florinio H. Bernabe, a physician specializing in obstetrics and gynecology, testified: He treated Danielle at the hospital's emergency room. She was doubled up, crying, and complaining of lower-stomach pain. Examination revealed a tear in the tissue between the birth canal and the rectum opening. During surgery "a big roll of tissue paper" was retrieved from her birth canal. Another tear, inside, had penetrated the abdominal cavity, and the doctor could see her intestines through this opening. Exploratory surgery revealed additional tears inside. Her injuries were confined to her genitalia. The doctor stated in his opinion the injuries "can be" consistent with insertion of an adult penis.

After Mrs. Johnson and Dr. Bernabe testified, the videotapes of Danielle's and Michael's testimony were played before the jury. A hearing to determine Danielle's and Michael's competency to testify was held prior to trial in defendant's presence. Danielle was examined first, but according to the transcript gave no audible response to any of the prosecutor's questions. Michael gave audible answers to most of the prosecutor's questions, most of which were leading, but on several occasions resorted to nodding his head on cross-examination and on several other occasions ceased answering altogether. A second attempt was made to question Danielle, during which she gave audible answers to less than one-third of the questions addressed to her; the remaining questions she answered inaudibly or by nodding or shaking her head. The judge found Michael competent to testify but reserved his ruling as to Danielle until after her testimony; he ordered on his own motion and over defendant's objection that both children's testimony be shown to the jury on videotape.

The day after the competency hearing, and after opening arguments, the jury was excused and Danielle was called to testify before the camera in the presence of both counsel, the judge and defendant. Danielle gave audible answers to some preliminary questions, but when questioned concerning the day she "got hurt," she ceased speaking. The prosecutor asked her several times who came into her room, prompting defense counsel to object that the question had been asked several times and not answered. Finally the prosecutor sought a recess, asserting Danielle was "frightened to death," and moved that defendant be removed from the courtroom during Danielle's testimony. Defense counsel objected, arguing defendant had made no remarks or gestures to influence the child. The court ordered defendant be placed in the "control room" where he could view Danielle's testimony simultaneously on video monitor; that defendant be provided a note pad and pencil for taking notes during her testimony; and that

defendant be permitted to confer with defense counsel during a recess between direct and cross-examination of Danielle.

On resumption of Danielle's examination, she was initially more verbal in her responses. She testified "Edward" came to the room where she slept with her brothers, took her to "my mom's" bedroom, and "[p]ut his thing in me," pointing between her legs; afterward he took her to the bathroom, "[p]ut tissue in me" (again pointing between her legs) and "[p]ut water in me" (pointing again).

Michael testified (in defendant's presence) as follows. On the day his sister "got hurt," he went to his mother's room to see cartoons. There he saw Danielle on his mother's bed with "Edward." Michael pointed at defendant when asked to show to whom he was referring. (Using two dolls, Michael demonstrated what he saw them doing.) Edward told him to go back to his room. Then Michael saw him put her on the toilet and put tissue and water in her (pointing when asked where); she was bleeding.

Ernestine Crawford, a social worker and counselor for sexually abused children and nonoffending parents, testified she interviewed Danielle at the hospital July 2, 1984; after playing with Danielle awhile, Mrs. Crawford asked her questions about her injury. Danielle answered yes when asked if she was bleeding and if someone made her bleed. Asked who, she said "a man." Asked who the man was, she said "my daddy." Asked if she was speaking of her daddy Edward, Danielle said yes.

Robert Lewis testified: He lived in the same building as the Johnsons. On the date in question he borrowed tools from defendant to use in breaking concrete directly behind the building. Defendant handed him the tools out the back door of the Johnson apartment between 7 and 7:30 a.m. No one came around, and he noticed nothing unusual.

Mary Chappel, Mrs. Johnson's sister, testified: When she heard Danielle was in the hospital she drove there from her residence in Chicago. In the hospital, Danielle told her what happened and that "Edward" did it. Several days later, when Danielle was home from the hospital, she and Danielle were playing with dolls in the presence of Danielle's brothers and within earshot of police officers when Danielle volunteered a demonstration of "the way Edward did me," using her own dolls. Mrs. Chappel admitted arguing with defendant about rent when the Johnsons lived with her.

Sergeant Willy Rich testified he saw Danielle every day she was in the hospital, but she gave no statement until July 3 when she told him what defendant did.

Defendant testified: On the date in question he locked the door when Mrs. Johnson left, then lent the neighbor some tools, then laid down. The next thing he recalled was hearing whimpering or crying. He found Danielle on the toilet. She said her stomach hurt and "man did it." He looked out the back door to see if anyone was around, noticing as he did that the door he locked after lending the tools was now unlocked. Danielle told him she went out the back door. He used tissue paper to stop the bleeding but did not put any in her. Thinking cold water might stop the bleeding, he used a "douche bag" on her three times, and was preparing a fourth when his wife returned. He returned home from the hospital before Mrs. Johnson did, to check on the boys. She arrived with police officers, who talked to the neighbor, looked all over for blood, and examined his penis and undershorts. The apartment was not large and defendant was "pretty sure" he would have heard if someone had broken in.

Defendant argues that Supreme Court Rule 414(a) (87 Ill. 2d R. 414(a)) does not authorize the instant videotaping procedure because the witnesses were not "unavailable" at trial, and because what was recorded was not a "deposition." Rule 414(a) reads: "If it appears to the court in which a criminal charge is pending that the deposition of any person other than the defendant is necessary for the preservation of relevant testimony because of the substantial possibility it would be unavailable at the time of hearing or trial, the court may *** order the taking of such person's deposition under oral examination or written questions for use as evidence at a hearing or trial." (87 Ill. 2d R. 414(a).) Rule 206(e) provides for videotaping of depositions. (87 Ill. 2d R. 206(e).) The determination of whether to permit use of a videotaped deposition is within the discretion of the trial court. *People v. Zehr* (1984), 103 Ill. 2d 472, 480, 469 N.E.2d 1062, 1065-66.

The witnesses were not unavailable at the instant trial. However, what was required was their testimony, not their mere presence. A fair reading of the rule is that the pronoun in the phrase "it would be unavailable" refers to the last preceding noun, *i.e.*, "testimony." Otherwise, the appropriate pronoun would be "he" or "she" or both. Thus it does not appear our supreme court in its rulemaking function intended Rule 414(a) be inapplicable in the presence of a witness unable to testify for whatever reason.

■ Was the testimony in question a "deposition"? To "depose" is to testify under oath. (Webster's Third New International Dictionary 605 (1976).) It is true that depositions are usually taken long before trial as defendant here suggests. However a witness can be deposed after trial has commenced. (*Plost v. Louis A. Weiss Memorial Hospi-*

*tal* (1978), 62 Ill. App. 3d 253, 259, 378 N.E.2d 1176, 1180; see 87 Ill. 2d R. 201(f).) Rule 414(a) does not purport to limit the time for deposition. In the instant case the trial court was unable to deduce that the critical testimony was unavailable until after the jury was chosen. The plain language of the rule authorizes this procedure. We find no cause to accept the limitations upon Rule 414(a) suggested by defendant.

Defendant relies on the sixth amendment to the United States Constitution, which provides that in all criminal prosecutions that the accused shall enjoy the right to trial by an impartial jury and to be confronted with the witnesses against him. The Illinois Constitution provides that in criminal prosecutions the accused shall have the right "to meet the witnesses face to face." (Ill. Const. 1970, art. I, sec. 8.) Despite the language difference, the two clauses are meant to protect the same interest. (*People v. Tennant* (1976), 65 Ill. 2d 401, 408, 358 N.E.2d 1116, 1119.) As early as 1895, the United States Supreme Court held the right of confrontation "must occasionally give way to considerations of public policy and the necessities of the case." (*Mattox v. United States* (1895), 156 U.S. 237, 243, 39 L. Ed. 409, 411, 15 S. Ct. 337, 340.) The traditional exception to the general rule requiring confrontation before the jury occurs where the witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. (*E.g.,* 56 U.S. 237, 39 L. Ed. 409, 15 S. Ct. 337.) This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement. *Barber v. Page* (1968), 390 U.S. 719, 722, 20 L. Ed. 2d 255, 258, 88 S. Ct. 1318, 1320.

■ The purposes generally stated in support of the general requirement of confrontation are two: The opportunity of cross-examination and the personal appearance of the accuser at trial. There is some disagreement as to the importance of the latter. Our supreme court, quoting Dean Wigmore, has stated that cross-examination is the rule's "main and essential purpose" and that the advantage obtained by the personal appearance of the witness at trial is "secondary," a result "accidentally" associated with the process of confrontation. (*People v. Tennant* (1976), 65 Ill. 2d 401, 409, 358 N.E.2d 1116, 1119.) The United States Supreme Court has observed that the interest secured by the sixth amendment is the right of cross-examination and that an adequate opportunity for cross-examination may satisfy the confrontation clause even absent physical confrontation. (*Douglas*

*v. Alabama* (1965), 380 U.S. 415, 418, 13 L. Ed. 2d 934, 937, 85 S. Ct. 1074, 1076.) To the contrary is *United States v. Benfield* (8th Cir. 1979), 593 F.2d 815, where an abduction victim testified by videotaped deposition; the defendant was present but out of the witness' sight. The *Benfield* court reasoned that "in some undefined but real way recollection, veracity, and communication are influenced by face-to-face challenge." (593 F.2d 815, 821.) See also *Herbert v. Superior Court* (1981), 117 Cal. App. 3d 661, 172 Cal. Rptr. 850, where the five-year-old sex-offense victim testified while the defendant was seated so he could hear but not see her. The *Herbert* court concluded the historical right of confrontation "has included the right to see one's accusers face-to-face, thereby giving the fact-finder the opportunity of weighing the demeanor of the accused when forced to make his or her accusation before the one person who knows if the witness is truthful. A witness' reluctance to face the accused may be the product of fabrication rather than fear or embarrassment." (117 Cal. App. 3d 661, 671, 172 Cal. Rptr. 850, 855.) However, in *Herbert,* the child was the only inculpatory witness presented against the defendant, and there was "no specific record of the child's conduct which motivated the lower court to devise the seating arrangement in question." (117 Cal. App. 3d 661, 670, 172 Cal. Rptr. 850, 855.) In *Benfield,* the victim was an adult, and the charge did not involve sex crimes; the court concluded that "[w]hat curtailment or diminishment might be constitutionally permissible depends on the factual context of each case, including the defendant's conduct. *** Any exception should be narrow in scope and based on necessity or waiver." (*United States v. Benfield* (8th Cir. 1979), 593 F.2d 815, 821.) Thus neither *Benfield* nor *Herbert* is inconsistent with the general proposition that the right of confrontation is not absolute and may be compromised upon proper showing of necessity and an opportunity for cross-examination.

In *State v. Sheppard* (1984), 197 N.J. Super. 411, 484 A.2d 1330, the State moved for permission to present the testimony of a 10-year-old alleged victim of sexual offenses, the defendant's stepdaughter, through the use of video equipment over the defendant's objection. The State proposed placing the judge, jury and defendant in the courtroom; the witness would testify in a room nearby in the presence of the prosecuting attorney, defense counsel, and a cameraman. A hearing was held on the State's application. A forensic psychiatrist with "substantial credentials relating ·to trial proceedings as well as medical matters" was the first witness. He testified he had interviewed the child and believed the accuracy of her testimony would be improved if in-court appearance were avoided. He provided reasons:

"An adult witness, testifying in court, surrounded by the usual court atmosphere, aware of a black-robed judge, a jury, attorneys, members of the public, uniformed attendants, a flag, and religious overtones, is more likely to testify truthfully. The opposite is true of a child, particularly when the setting involves a relative accused by her of sexual abuse. She becomes fearful, guilty, anxious, and traumatized. In most cases, she will have been exposed to both pleasant and abusive associations with the accused. As a consequence, she has ambivalent feelings. Anger against the relative is opposed by feelings of care, not only for him but also for other family members who may be harmed by a conviction. There is guilt as well as satisfaction in the prospect of sending the abuser to prison. These mixed feelings, accompanied by the fear, guilt, and anxiety, mitigate the truth, producing inaccurate testimony. The video arrangement, because it avoids courtroom stress, relieves these feelings, thereby improving the accuracy of the testimony." (197 N.J. Super. 411, 416, 484 A.2d 1330, 1332.)

He further testified that possible long-term effects *of her testimony in court* would be nightmares, depression, problems with eating, sleeping and school, behavioral difficulties including "acting out," and sexual promiscuity.

Two attorneys with substantial experience in the prosecution of child-abuse cases testified in *Sheppard* regarding the difficulties of presenting children's testimony. Their testimony showed that as a practical matter if a child's testimony in a sex-abuse case were required to be presented in the traditional in-court setting the likelihood of completing a trial was slight.

The *Sheppard* court approved the State's application, subject to conditions (*inter alia*) that defendant and his attorney be provided with a video system which would permit constant private communication between them during the child's testimony, and that the child's testimony be interrupted at intervals to allow defendant opportunities for consultations.

In *State v. Melendez* (1982), 135 Ariz. 390, 661 P.2d 654, the defendant was convicted of molesting his six-year-old daughter, whose testimony was videotaped in advance of trial in the presence of the defendant, his counsel, the trial judge and the prosecutor. A clinical psychologist who examined the witness testified the witness would probably become uncommunicative if called to testify before a jury. The Arizona court of appeals affirmed the judgment.

■ Measured against the foregoing authorities, we believe it was

appropriate to allow Danielle to testify via videotape in this case. We believe the opportunity for cross-examination and proof of necessity of the videotaping procedure were adequate. As to necessity, the trial court did not have the benefit of the expert testimony submitted in *Sheppard* or to a lesser degree in *Melendez*. In the case at bar the court tried to question Danielle without success before resorting to the videotape procedure. What the failed attempts showed was that the victim herself would rather let the alleged wrongdoer go unpunished than participate in the courtroom interrogation. We believe the actual failed attempts coupled with the showing in the record of the trauma caused by the crime itself were sufficient proof of the necessity of the videotape procedure.

We also believe there was sufficient opportunity for cross-examination of Danielle. The opportunity made available here was at least equal to that approved in *State v. Sheppard,* and compares favorably with *People v. Nastasio* (1960), 19 Ill. 2d 524, 168 N.E.2d 728. In *Nastasio,* our supreme court held cross-examination at the depositions by defense counsel was inadequate, as defendant might have been prejudiced by his own absence because his suggestions to his attorney might be indispensable to effective cross-examination. 19 Ill. 2d 524, 530-31, 168 N.E.2d 728, 731.

The State concedes that the reasons for deposing Michael Willis on videotape were "not as compelling" as the reasons for doing so with Danielle. The State argues, however, that Michael's testimony was "cumulative" to Danielle's testimony and that of other witnesses who testified Danielle accused defendant. This understates the importance of the sole-eyewitness testimony other than Danielle's. However, we believe the necessity of videotaping Michael's testimony was sufficiently shown when the seven-year-old was examined in the presence of the judge, the two attorneys, defendant and the court reporter to determine his competency to testify. Michael had to be prompted by defense counsel to "say something out loud" and failed to answer many questions despite their leading nature. We believe the trial court was entitled to conclude that Michael would become even more reticent when confronted by a jury of 12. We find no error in the admission of Michael's videotaped testimony.

Defendant also contends the court erred in removing him from the room in which Danielle was testifying and requiring him to watch from a "control room." As we have noted above, the right of confrontation is not absolute (*Mattox v. United States* (1895), 156 U.S. 237, 39 L. Ed. 409, 15 S. Ct. 337), and the procedure here was similar to that approved in *State v. Sheppard.* While we are reluctant to

sanction a defendant's removal from the scene of testimony in any case, the five-year-old's reticence in defendant's presence and the improvement in her testimony upon his removal better demonstrated the necessity of the procedure than could the opinion of any expert. We have already observed that the opportunity for cross-examination was constitutionally sufficient. We find no error in removing defendant from the witness' sight in this unusual case.

Defendant also argues he was denied his right to be present at all stages of his trial because he was not permitted to remain in the room in which the children testified. In truth he was present at all stages of his trial, so far as the record reveals, and this contention is another way of stating his prior contention regarding the right of confrontation. As we have seen, that right is not absolute.

Section 115—11 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 115—11), not heretofore construed by Illinois courts of review, appears to pertain to defendant's forced absence during Danielle's testimony, but a careful reading of that provision indicates its purpose is otherwise. Section 115—11, effective September 9, 1982, provides that in a prosecution for an offense under article II (Ill. Rev. Stat. 1983, ch. 38, par. 11—1 *et seq.*), which includes the instant prosecution, where the alleged victim is under 13 years of age "the court may exclude from the proceedings while the victim is testifying, all persons, who, in the opinion of the court, do not have a direct interest in the case, except the media." (Ill. Rev. Stat. 1983, ch. 38, par. 115—11.) Section 115—11 appears designed to address the problems considered in *Globe Newspaper Co. v. Superior Court* (1982), 457 U.S. 596, 73 L. Ed. 2d 248, 102 S. Ct. 2613, in which the United States Supreme Curt held unconstitutional a Massachusetts statute requiring that the media and public be excluded from trials regarding certain sexual offenses where the victim was under 18 years of age. In *Globe Newspaper* the court concluded the interest of protecting such victims did not justify a mandatory (*i.e.,* nondiscretionary) closure rule.

■ Our legislature's declaration that the court "may" exclude all disinterested persons "except the media" would at first inspection appear to require the conclusion that interested persons (including the accused) may not be excluded, under the maxim *expressio unius est exclusio alterious*. However, we need not consider what the legislature intended to except by implication, for section 115—11 carries its own express exception—the media. In light of this express exception, we think a fair reading of section 115—11 is that the legislature did not intend it to apply to exclusion from the courtroom *vel non* of in-

terested persons, the accused included.

■ Defendant contends he was denied the right to effective assistance of counsel during Danielle's testimony because he was physically incapable of speaking with defense counsel during this period of time. As we have noted, defendant was provided with a recess for the purpose of conferring with counsel prior to cross-examination, and with the means to take notes so he would not have to rely on his memory. A defendant's freedom to consult with counsel during trial is not absolute. It is limited to a degree by the trial judge's responsibility to maintain decorum and enforce order. (*People v. Lewis* (1977), 53 Ill. App. 3d 89, 95, 368 N.E.2d 619, 624.) In the unusual case at bar, in view of the apparent timidity of the minor witnesses, it was doubly important that defendant not interrupt their testimony by conversation. Since defendant was not necessarily entitled to confer with counsel during actual testimony, and since defendant does not claim he was prevented from conferences during the break in the testimony, we find no abridgment of defendant's right to counsel at trial.

■ Defendant complains that the videotapes themselves were in black and white and the witness' image "not as large or clear as it might be." Defendant also complains that the questioner was not visible on the recordings. Thus defendant argues there was too much and not enough shown on the recordings. Defendant cannot have it both ways. In any event, defendant mentions nothing specific that the jury missed and merely argues what "could have been." We do not believe that this speculation requires disapproval of the procedure. The advantages and disadvantages of the videotaping procedure do not favor one party over the other. See *State v. Melendez* (1983), 135 Ariz. 390, 393, 661 P.2d 654, 657; *State v. Sheppard* (1984), 197 N.J. Super. 411, 430, 484 A.2d 1330, 1341 (noting the widespread availability of television and concomitant familiarity with its technical characteristics and distortions).

■ Finally, defendant contends he is entitled to full credit against the statutory $25 fine assessed against him under section 10 of the Violent Crime Victims Assistance Act (Ill. Rev. Stat., 1984 Supp., ch. 70, par. 510). In *People v. James* (1985), 133 Ill. App. 3d 623, 479 N.E.2d 344, this court rejected the State's contention that section 110—14 of the Code of Criminal Procedure of 1963, which provided for a credit of five dollars per day of incarceration against a fine levied on conviction (Ill. Rev. Stat. 1983, ch. 38, par. 110—14), did not apply to Violent Crime Victims Assistance Act fines. Section 10 of the Violent Crime Victims Assistance Act has been amended and now provides that section 110—14 does not apply to fines im-

posed under the Violent Crime Victims Assistance Act. Ill. Rev. Stat. 1985, ch. 70, par. 510.

An amendment to a statute is an appropriate source for determining legislative intent. (*People v. Rink* (1983), 97 Ill. 2d 533, 540, 455 N.E.2d 64, 68.) Thus one might conclude that this court's construction of section 10 of the Violent Crime Victims Assistance Act was not in accord with the original intent of the legislature. (*Creel v. Industrial Com.* (1973), 54 Ill. 2d 580, 584, 301 N.E.2d 275, 277.) However, the addition of a new provision in a statute by amendment may also be interpreted as an indication of the absence of its implied or prior existence. (54 Ill. 2d 580, 584, 301 N.E.2d 275, 278.) That the legislature determined the amendment in question should take effect on the first day of 1986 rather than immediately upon its becoming law lends decisive weight to the latter interpretation in my view.

For the foregoing reasons, defendant's conviction and sentence are hereby affirmed. While I would modify his sentence to reflect a credit of $25 against the $25 fine, since he served more than five days of incarceration, less than a majority of the court subscribes to this view. The effect thereof is to deny him any credit against his fine.

Affirmed.

JUSTICE KARNS, concurring in part and dissenting in part:

I concur in Judge Welch's opinion except as it grants defendant $25 credit against his fine of $25 imposed pursuant to the Violent Crime Victims Assistance Act. See *People v. Williams* (1986), 142 Ill. App. 3d 266, 491 N.E.2d 941.

JUSTICE HARRISON, dissenting:

The confrontation clause of the sixth amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution to "be confronted with the witnesses against him." (U.S. Const., amend. VI; *Delaware v. Van Arsdall* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 674, 682-83, 106 S. Ct. 1431, 1435.) There can be no doubt that the right of confrontation includes not only the right of cross-examination (*Lee v. Illinois* (1986), ___ U.S. ___, ___, 90 L. Ed. 2d 514, 525, 106 S. Ct. 2056, 2061-62), but also the right to see one's accusers face to face when cross-examination takes place. (*United States v. Benfield* (8th Cir. 1979), 593 F.2d 815, 821.) As one Federal court has noted:

> "Basically the confrontation clause contemplates the active participation of the accused at all stages of the trial, including the

face-to-face meeting with the witness at trial or, at the minimum, in a deposition allowing the accused to face the witness, assist his counsel, and participate in the questioning through his counsel." 593 F.2d 815, 821.

Illinois law likewise secures to criminal defendants the right to be present at all stages of the trial (*People v. Mallett* (1964), 30 Ill. 2d 136, 141-42, 195 N.E.2d 687), to appear and defend in person, and to meet the witnesses face to face (*Potts v. People* (1967), 80 Ill. App. 2d 195, 199-200, 224 N.E.2d 281, 283). The right of a defendant to confront witnesses face to face is, indeed, guaranteed by the express terms of article I, section 8, of our constitution (Ill. Const. 1970, art. I, sec. 8).

In this case, the testimony by defendant's alleged victim was given not in open court, but via a videotaped deposition. Over objection, defendant was not permitted to be physically present at the deposition and had no other opportunity to confront the witness face to face during examination or cross-examination before the jury. There is no evidence that defendant's conduct was disorderly, disruptive or disrespectful of the court, or that he attempted in any way to intimidate the witness. Under the rationale of *United States v. Benfield* (8th Cir. 1979), 593 F.2d 315, and *Herbert v. Superior Court* (1981), 117 Cal. App. 3d 661, 172 Cal. Rptr. 850, 19 A.L.R.4th 1276, and in view of the plain language of article I, section 8, of the Illinois Constitution, I therefore believe that defendant's right of confrontation was abridged in contravention of both the Federal and State constitutions.

The majority points out that *Benfield* does not announce an absolute rule. Even so, that case permits no curtailment of defendant's right of confrontation on the facts present here. The cases are analogous. *Benfield* involved the testimony of a kidnaping victim who, according to her psychiatrist, was suffering debilitating psychiatric problems directly related to her abduction. Although the psychiatrist recommended that she not be required to testify at trial, or face the defendant, or that circumstances less stressful than a trial courtroom be arranged, the court of appeals nevertheless found that exclusion of defendant from the room where the deposition was taken abridged his sixth amendment right to confrontation. This was so despite the fact that under procedures similar to the one followed here, the defendant was permitted to observe the deposition on a monitor; could halt the questioning by sounding a buzzer, at which time the deposition would be interrupted and his attorney would leave the room to consult with him; and his attorney was allowed to cross-examine the witness.

As for *Herbert,* the majority suggests that it is inapposite because "there was no specific record of the child's conduct which motivated the unorthodox seating arrangement," requiring the defendant in a sex-abuse case to sit at trial where he could hear, but not see, his alleged victim, a five-year-old girl, while she testified. This is misleading. Some record of the conduct was made. In its opinion finding that the seating arrangement violated the defendant's right to be confronted by witnesses, the California Court of Appeals specifically noted:

> "From the magistrate's statement read into the record, it appears the child, at the preliminary examination, was initially reluctant or unable to testify. The court thereupon adjourned to chambers with the child and counsel but not the defendant. The court concluded the child 'was disturbed by the number of people in the courtroom and in particular with the presence of the defendant ***.' " *Herbert v. Superior Court* (1981), 117 Cal. App. 3d 661, 664, 172 Cal. Rptr. 850, 851.

No more or less was involved in the case now before us.

The majority's reliance on *State v. Melendez* (1983), 135 Ariz. 390, 661 P.2d 654, is misplaced. As the majority itself notes, the defendant in that case was permitted to be present, along with his attorney, the prosecutor, and the trial judge, at the videotaped deposition of his six-year-old daughter, whom he was accused of molesting. Defendant here was denied even that right. His opportunity for any face-to-face confrontation with the alleged victim during her testimony was completely nonexistent.

The majority here struggles to balance the defendant's right to confrontation against the difficulties of prosecuting sex-abuse cases involving children. That balance, however, has already been struck by the General Assembly through enactment of section 115—11 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—11). Section 115—11 provides that in a prosecution for certain criminal offenses, including the one with which defendant here was charged:

> "[W]here the victim of the offense is a minor under 13 years of age, the court may exclude from the proceedings while the victim is testifying, all persons who, in the opinion of the court, do not have a direct interest in the case, except the media."

The defendant will always have a direct interest in the case. Consistent with the defendant's right of confrontation, he is therefore not among those who may be excluded during the victim's testimony. The procedure endorsed today by the majority is thus not only unconstitu-

tional, but in contravention of State statute.

Finally, I cannot agree that the use of either of the videotaped depositions was proper under Supreme Court Rule 414 (87 Ill. 2d R. 414). An evidence deposition can be taken for use at trial, but only on a showing that the witness is unavailable to testify in person. (*People v. Winfield* (1983), 113 Ill. App. 3d 818, 833, 447 N.E.2d 1029, 1041.) The witnesses deposed here were obviously available to give testimony personally. Although they had difficulty responding to questions, one cannot say on this record that they were objectively unable to do so because of any physical or psychiatric infirmity. Their reluctance may have stemmed from fear, embarrassment or guilt as the majority suggests, or it may have been caused because they were not telling the truth and could not bring themselves to lie in defendant's presence. We cannot be sure. In either event, reluctance, rather than actual inability to appear at trial, will not suffice to justify use of a witness' deposition in lieu of live testimony under Rule 414. 113 Ill. App. 3d 818, 833, 447 N.E.2d 1029, 1042.

Even if defendant's alleged victim had been "unavailable," her deposition nevertheless failed to comport with the requirements of Rule 414. The majority indicates that defendant's right to confrontation was adequately served by his attorney's cross-examination of the witness. Supreme Court Rule 414(e) (87 Ill. 2d R. 414(e)), expressly provides, however, that the "defendant *and* defense counsel *shall* have the right to confront *and* cross-examine any witness whose deposition is taken." (Emphasis added.) Under this rule, the defendant himself was entitled to be present and to confront, as well as cross-examine, the witness.

Due to increased public awareness, child abuse has become one of the most urgent social problems of this decade. I sympathize with the majority's desire to permit innovations in trial practice which will enhance the ability of the State to bring accused child abusers to justice, but any such innovations must comport with constitutional protections, State statutes, and the rules of our supreme court. The procedure here did not do so. Accordingly, I would reverse and remand for a new trial.