530 A.2d 275

Richard Bryan WILDERMUTH

v.

STATE of Maryland.

James Sylvester McKOY

v.

STATE of Maryland.

Nos. 2, 7, Sept. Term, 1987.

Court of Appeals of Maryland.

Sept. 10, 1987.

William M. Ferris (Lynn T. Krause, on the brief), Baltimore for appellant Wildermuth; and Nancy L. Cook, Assigned Public Defender, Washington, D.C., for appellant McKoy.

Ronald M. Levitan, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief) Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH *, McAULIFFE and ADKINS, JJ.

ADKINS, Judge.

In separate jury trials in the Circuit Court for Anne Arundel County, appellants Richard Bryan Wildermuth and James Sylvester McKoy were each convicted of and sentenced for, among other things, child abuse. In each case the alleged child victim was permitted to testify from outside the courtroom via closed-circuit television, pursuant to

---

* Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Annotated Code, Courts and Judicial Proceedings Article, § 9–102 (1984 Repl.Vol., 1986 Supp.). Each appellant now launches a multifaceted attack on his convictions.[1] The central thrust in each case is the contention that § 9–102 is unconstitutional because it violates the confrontation clause of the sixth amendment to the United States Constitution (applicable to the states through the fourteenth amendment) as well as art. 21 of the Maryland Declaration of Rights. We reject those contentions. We also reject appellants' other constitutional assaults on § 9–102, and affirm McKoy's convictions. We reverse Wildermuth's convictions and remand his case for a new trial, however, because we agree that in his case the threshold showing essential to the invocation of § 9–102 has not been made.

I. *Section 9–102 and the Right to Confrontation*

Section 9–102 was enacted by Chapters 495 and 499, Acts of 1985.[2] It provides:

(a)(1) In a case of abuse of a child as defined in § 5–901 of the Family Law Article or Article 27, § 35A of the Code, a court may order that the testimony of a child victim be taken outside the courtroom and shown in the courtroom by means of closed circuit television if:

(i) The testimony is taken during the proceeding; and

(ii) The judge determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate.

(2) Only the prosecuting attorney, the attorney for the defendant, and the judge may question the child.

(3) The operators of the closed circuit television shall make every effort to be unobtrusive.

---

1. Both appellants appealed to the Court of Special Appeals. Because of the public importance of several of the issues involved, we granted certiorari while the cases were still pending in the intermediate appellate court.

2. Each of these chapters enacted identical provisions, one set emanating from a Senate Bill and the other from a House Bill.

(b)(1) Only the following persons may be in the room with the child when the child testifies by closed circuit television:

(i) The prosecuting attorney;

(ii) The attorney for the defendant;

(iii) The operators of the closed circuit television equipment; and

(iv) Unless the defendant objects, any person whose presence, in the opinion of the court, contributes to the well-being of the child, including a person who has dealt with the child in a therapeutic setting concerning the abuse.

(2) During the child's testimony by closed circuit television, the judge and the defendant shall be in the courtroom.

(3) The judge and the defendant shall be allowed to communicate with the persons in the room where the child is testifying by any appropriate electronic method.

(c) The provisions of this section do not apply if the defendant is an attorney pro se.

(d) This section may not be interpreted to preclude, for purposes of identification of a defendant, the presence of both the victim and the defendant in the courtroom at the same time.

In Wildermuth's case the statute was invoked after Judge Bruce Williams heard testimony from two expert witnesses. On the basis of that testimony (which we shall later review in detail), he found that Wildermuth's nine-year-old daughter, the alleged victim, "would be under serious emotional distress were she required to testify in open court in front of the jury and her father and assorted other court personnel and would not be reasonably able to communicate." Thus, having made the preliminary finding required by § 9–102(a)(1)(ii), he directed that the alleged victim's testimony "be taken through closed circuit T.V."

Somewhat different circumstances preceded the use of § 9–102 in McKoy's case. His nine-year-old daughter, the

alleged victim, was called to testify in open court. She was sworn and responded to a number of questions designed to determine her competence as a witness. During the course of the questioning, she became upset and seemed unable to answer further, although she indicated she "could answer [the questions] if we went into another room, with the camera...." During a lengthy discussion of the constitutionality of § 9–102, Judge Robert Heller noted that the child "was having difficulty in being able to reasonably communicate" but raised some question as to what was meant by the phrase "serious emotional distress." The State was prepared to present expert testimony on the § 9–102(a)(1)(ii) threshold issue, but that became unnecessary when McKoy's trial counsel said he was not opposing the use of closed circuit television on the ground that the prerequisite conditions had not been established. Judge Heller thereafter directed that the alleged victim's testimony be taken pursuant to § 9–102.

In each case the alleged victim was taken to the judge's chambers. The subsequent procedure was described by Judge Heller when he explained it to the jury in McKoy's case:

> ... [T]his closed circuit television arrangement is an arrangement which is allowed under the Maryland law. However[,] I instruct you that you are not to give the testimony of this witness any greater or lesser weight than you would ... if she were testifying before you here in the courtroom.

> Her testimony is not recorded. It is live testimony and will actually be taking place in the room which is adjacent to this room. Now under the arrangement that is permitted under the Maryland law, Mr. Caroom representing the State, and Mr. Ronay representing Mr. McKoy, will be present with the witness in this closed chamber or in this other room ... and Mr. Caroom, who has called her or will call her as a witness, will, of course, examine her and then she will be subject to cross-examination by Mr. Ronay on behalf of the Defendant. And the process will

be the same as if the witness were in the courtroom. If there are any objections, the objections will be noted. The only difference will be that if there are objections, the Counsel—the two attorneys will come from the room behind us here, behind me, and will come out through this door and approach me here at the bench so that I can make a decision and a ruling on any objections that are made. . . .

Furthermore, because the Defense attorney will be in the room next door and not seated with his client, and because there may be occasions that his client might want to say something to him—or vice versa, there will be telephone communications directly between Mr. Ronay and Mr. McKoy. You see a telephone that's—sitting on top of the counsel table and you will see that Mr. McKoy will have that available to him and will probably have [it] at his ear just to listen to his attorney in the event there is any reason to discuss anything between the two of them, just so they have the same accessibility to each other as they would if they were sitting here at the counsel table together.

### A. *Scope of the Right to Confrontation*

■ Appellants assert that this procedure, clearly sanctioned by § 9–102, falls afoul of the sixth amendment to the United States Constitution and of art. 21 of the Maryland Declaration of Rights. The latter in pertinent part declares:

That in all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him. . . .

The federal provision echoes that of Maryland:

In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . .[3]

---

**3.** The Maryland provision first appeared as art. 19 of our Declaration of Rights of 1776. The sixth amendment was not adopted until 1791.

Both Wildermuth and McKoy would persuade us that their rights of confrontation were denied because the § 9–102 procedure denied them physical confrontation with the victims-witnesses; while each of them could see the testifying witness on the television monitor, neither witness could see the accused or, for that matter, the judge and jury. Analysis of these arguments requires us to consider the scope of the right of confrontation conferred by the above provisions. We consider the sixth amendment and art. 21 together, since both secure the same right. *Tichnell v. State,* 290 Md. 43, 55, 427 A.2d 991, 997 (1981); *Crawford v. State,* 282 Md. 210, 211, 383 A.2d 1097, 1098 (1978).

"[T]he Confrontation Clause comes to us on faded parchment." *California v. Green,* 399 U.S. 149, 173–174, 90 S.Ct. 1930, 1943, 26 L.Ed.2d 489, 506 (1970) (Harlan, J., concurring). This is because "a satisfactory history of the right of confrontation has yet to be written." Graham, *The Right to Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One,* 8 Crim.L.Bull. 99, 104 (1972) [footnote omitted]. In *Gregory v. State,* 40 Md.App. 297, 306–324, 391 A.2d 437, 443–454 (1978), Judge Wilner has traced much of the background. There is a helpful account in *Stores v. State,* 625 P.2d 820, 823 n. 4 (Alaska 1980). *And see* 1 J. Stephen, *History of the Criminal Law of England,* 326–358 (1883), and 9 W. Holdsworth, *A History of English Law,* 214–219 (3d ed. 1944).

The sources tell us that in the late sixteenth and early seventeenth centuries in England, proof in criminal cases was often by way of reading depositions, confessions of accomplices and so on, despite demands by the accused that the witnesses against him be required to confront him face to face.[4]

---

It is applicable to the states via the fourteenth amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

**4.** At Sir Walter Raleigh's treason trial in 1603, for instance, one of Raleigh's accusers was Lord Cobham, and Cobham's accusation was by *ex parte* written statement. Raleigh (without success) argued:

By the end of the seventeenth century, however, this practice of prosecution by written deposition, the same sources explain, had been replaced by one in which the accuser was produced in open court. Thus, in 1768, Blackstone could look with his customary pride at the "confronting of adverse witnesses," 3 W. Blackstone, *Commentaries on the Law of England*, 373 (Facsimile at 1st ed. 1768), a practice he described as "this, the English way of giving testimony, *ore tenes*," in contrast to methods used by lesser mortals on the continent. *Id.* at 374.[5]

Thus, when the first Maryland Declaration of Rights was adopted in 1776, and when the sixth amendment was adopted some 15 years later, there was a valued and well-established practice in England that witnesses against the accused ordinarily would meet the accused face to face in open court. But just how the framers of the Maryland Declaration of Rights or the United States Bill of Rights viewed that practice, or what precise interests they thought it would serve, we do not know. In that regard, the historical record is silent. *See* B. Schwartz, *The Bill of Rights: A Documentary History* (1971). Nevertheless, the Supreme Court has identified a reason for the practice. It was

---

The proof of the Common Law is by witness and jury; let Cobham be here, let him speak it. Call my accuser before my face and I have done.

2 *Howell's State Trials* 15 (Corbett's ed. 1816). Sir Walter Raleigh was not the only 16th or 17th Century accused who made similar demands. *See, e.g.*, the trial of John Udall in 1590: "My lords, I answer it thus, denying it to be his Testimony; for if it be, why is he not present to verify it face to face, according to the law?" 1 *Howell's State Trials* 1282 (1816); the trial of John Lilburne in 1637; 3 *Howell's State Trials* 1322 (1816); Throckmorton's Trial of 1554, 1 *Howell's State Trials* 879 (1816); Lord Strafford's Trial of 1680, 7 *Howell's State Trials* 1293, 1341 (1816).

5. The language quoted from Blackstone deals with the trial of civil actions, but he points out that the "doctrine of evidence upon pleas of the crown is in most respects the same as in civil actions." 4 *Commentaries on the Law of England*, 350 (1769).

to prevent depositions or *ex parte* affidavits, such as were sometimes used in civil cases, being used against the prisoner in lieu of personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States*, 156 U.S. 237, 242–243, 15 S.Ct. 337, 339, 39 L.Ed. 409, 411 (1895). We have expressed a similar view: "It is the primary object of the constitutional provision requiring confrontation to prevent depositions or *ex parte* affidavits from being used against a person accused of crime in lieu of personal examination and cross-examination of the witnesses." *Crawford*, 282 Md. at 214, 383 A.2d at 1099 [citations omitted].

Authorities do not always agree on what lies at the core of the confrontation right. Wigmore, on the one hand, takes the view that the indispensable purpose of confrontation is to protect the right of cross-examination. "So far, then, as the essential purpose of confrontation is concerned, it is satisfied if the opponent has had the benefit of full cross-examination." 5 *Wigmore on Evidence*, § 1399 (Chadbourn rev. 1974).[6]

Despite his argument for the primacy of cross-examination, Wigmore concedes that there is a "secondary" concern, although he characterizes it as "dispensable...." 5 *Wigmore*, § 1395 at 153–155. According to him, this secondary benefit of confrontation lies in the ability of the judge and jury to observe the witness's *"deportment while testifying"* and thus "to obtain the elusive and incommunicable evidence" produced by that observation—evidence

---

**6.** This notion derives in a large part from Wigmore's concept that the development of the confrontation right itself was an outgrowth of the development of the hearsay rule. 5 *Wigmore*, § 1397.

thought to aid in the evaluation of credibility. 5 *Wigmore*, § 1395 at 153 [emphasis in original]. *See also* 5 *Wigmore* § 1399. But while Wigmore notes that this procedure may produce "a certain subjective moral effect ... upon the witness," he discounts the truth-enhancing aspect of this sort of confrontation as a supposition of an "earlier and more emotional period...." 5 *Wigmore* § 1395 at 153 n. 2. In his view the advantage derived from observation of the witness is for the benefit of the tribunal, and

> does not arise from the confrontation of the *opponent* and the witness; it is not the consequence of those two being brought face to face. It is the witness' presence before the *tribunal* that secured the secondary advantage....

5 *Wigmore* § 1395 at 154 [emphasis in original].

A number of courts have adopted this reasoning, and have concluded or suggested that the confrontation clause does not demand an "eyeball-to-eyeball" encounter between accusing witness and accused. *See, State v. Coy*, 397 N.W.2d 730, 733–734 (Iowa 1986), *appeal filed* April 15, 1987, *prob. juris noted*, —— U.S. ——, 107 S.Ct. 3260, 97 L.Ed.2d 760 (1987); *Commonwealth v. Willis*, 716 S.W.2d 224, 227–231 (Ky.1986); *Appeal in Pinal County Juvenile Action*, 147 Ariz. 302, 304–306, 709 P.2d 1361, 1363–1364 (App.1985); *People v. Johnson*, 146 Ill.App.3d 640, 646–52, 100 Ill.Dec. 330, 334–337, 497 N.E.2d 308, 312–315 (1986); *State v. Daniels*, 484 So.2d 941, 944 (La.Ct.App.1986); *People v. Algarin*, 129 Misc.2d 1016, 1021, 498 N.Y.S.2d 977, 981 (N.Y.Sup.Ct.1986) (requirement of "face to face" confrontation does not mandate physical confrontation; it requires no more than opportunity to cross-examine).

Although the Supreme Court has as yet made no precise determination on this point, it has on numerous occasions expressed preference for "face to face" contact between the accuser and the accused. In *Kirby v. United States*, 174 U.S. 47, 55, 19 S.Ct. 574, 577, 43 L.Ed. 890, 894 (1899), for example, the Court reasoned that "a fact which can be primarily established only by witnesses cannot be proved

against an accused ... except by witnesses who confront him at the trial, upon whom he can look while being tried." *See also Dowdell v. United States,* 221 U.S. 325, 330, 31 S.Ct. 590, 592, 55 L.Ed. 753, 757 (1911); *Delaware v. Fensterer,* 474 U.S. 15, 18–19, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 18 (1985); and *Lee v. Illinois,* 476 U.S. 530, ——, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514, 515 (1986). *But see California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497 (1970); and *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974).

Despite the debate surrounding the scope of the rights conferred by the confrontation clause, one proposition remains undisputed. The essential purpose of the confrontation clause is truth-finding. With this in mind a number of legal scholars have espoused a view contrary to that of Wigmore. Stephen, for instance, noted the relationship between confrontation and truth-finding: the practice of face-to-face confrontation is "not only more humane, but more conducive to the discovery of truth than the earlier" practice of trial on *ex parte* deposition. J. Stephen, 1 *History of Criminal Law of England* 359 (1st ed. 1883). *See also McCormick on Evidence,* § 245, at 727 (3d ed. 1984): "The solemnity of the occasion and possibility of public disgrace can scarcely fail to impress the witness, and falsehood no doubt becomes more difficult if the person against whom directed is present." *Id.*

The search for truth, a major basis for the requirement of confrontation, ordinarily requires cross-examination at a criminal trial. That proposition, as we have seen, is universally accepted. The search for truth also ordinarily requires the accusing witness to testify in court in the presence of the fact-finder and the accused. There is virtual unanimity as to the first portion of this second proposition and considerable agreement as to the second.[7]

---

7. *See United States v. Benfield,* 593 F.2d 815, 821 (8th Cir.1979); *State v. Warford,* 223 Neb. 368, 374, 389 N.W.2d 575, 580–582 (1986); *Herbert v. Superior Court,* 117 Cal.App.3d 661, 667, 172 Cal.Rptr. 850,

At least arguably, all of these confrontation requirements were met in these cases. Cross-examination occurred. While the accusing witnesses were not actually in court, they were under oath, in the presence of counsel, and in the view of juries, judges, and defendants. The judges presided over and controlled the proceedings. *State v. Warford,* 223 Neb. at 377, 389 N.W.2d at 581–582. But the witnesses could not see the defendants. Does confrontation ordinarily require that the accuser view the accused while the former is testifying? We believe so. That is consistent with the concept of confrontation as a device to advance the search for truth.

In *United States v. Benfield,* 593 F.2d 815 (8th Cir.1979), Cady, an adult kidnapping victim, was reluctant to testify at the trial of Benfield, her alleged kidnapper. Cady's deposition was taken on videotape under circumstances somewhat like those in the present cases. Witness Cady was in a room with counsel. Defendant Benfield was in a separate room, but could observe Cady on a television monitor, halt questioning by sounding a buzzer, and confer with his lawyer. But Cady could not see Benfield and "was apparently" kept unaware of Benfield's presence in the building. *Id.,* 593 F.2d at 817. At trial and over Benfield's sixth amendment objection, the videotape was shown to the jury.

The Eighth Circuit held that this procedure abridged Benfield's sixth amendment rights. It said:

> Normally the right of confrontation includes a face-to-face meeting at trial at which time cross-examination takes place. . . . Of course, confrontation requires cross-examination in addition to a face-to-face meeting. . . . The right of cross-examination reinforces the importance of physical confrontation. Most believe that in some undefined but real way recollection, veracity, and commu-

---

853 (1981); *State v. Vigil,* 103 N.M. 583, 586, 711 P.2d 28, 31 (1985) where other courts have found that the confrontation clause does demand an "eyeball to eyeball" encounter between accusing witness and accused.

nication are influenced by face-to-face challenge. This feature is part of the sixth amendment right additional to the right of cold, logical cross-examination by one's counsel. While a deposition necessarily eliminates a face-to-face meeting between witness and jury, we find no justification for further abridgment of the defendant's rights. *Id.*, 593 F.2d at 821 [footnotes omitted].

Of like tenor is *Herbert v. Superior Court*, 117 Cal. App.3d 661, 172 Cal.Rptr. 850 (1981). In that case Herbert was charged with sexual offenses against a five-year-old child. At trial, Herbert was seated so that he could hear but could not see the child when she testified. Nor could the child see him. The California intermediate appellate court concluded that "[b]y allowing the child to testify against defendant without having to look at him or be looked at by him, the trial judge not only denied defendant the right to confrontation but also foreclosed an effective method for determining veracity." *Id.*, 117 Cal.App.3d at 668, 172 Cal.Rptr. at 853. The court explained:

The historical concept of the right of confrontation has included the right to see one's accusers face-to-face, thereby giving the fact-finder the opportunity of weighing the demeanor of the accuse[r] when forced to make his or her accusation before the one person who knows if the witness is truthful. A witness's reluctance to face the accused may be the product of fabrication rather than fear or embarrassment.

*Id.*, 117 Cal.App.3d at 671, 172 Cal.Rptr. at 855. *See also State v. Mannion*, 19 Utah 505, 512, 57 P. 542, 544 (1899) (Defendant's confrontation right denied when child victim of rape testified from part of courtroom distant from defendant and with her back to him. The defendant "had the right, not only to examine the witnesses, but to see into the face of each witness while testifying against him, ... the right to see and be seen, hear and be heard....")

That an actual physical two-way confrontation, between accuser and accused, is normally an element of the right of confrontation is consistent with our previous reading of art.

21 of the Declaration of Rights. In *Johns v. State*, 55 Md. 350 (1881), for instance, our predecessors permitted the use of certain documentary evidence at trial (a certificate of the Comptroller of the Treasury) but pointed out that

> Where the prosecution is to be maintained by the testimony of living witnesses ... they are required to be produced in court, confronted with the accused, and deliver their testimony under the sanction of an oath, and be subject to cross-examination. In other words, no witness shall give his testimony in secret, or out of the presence of the accused; and no party shall be put upon his trial upon mere hearsay evidence; but the witness shall be produced and be subject to all the tests that the law has devised for the full disclosure of the truth.

*Id.*, 55 Md. 350, 360 (1881).

And in *Dutton v. State*, 123 Md. 373, 91 A. 417 (1914), Chief Judge Boyd cited *Johns* in reversing a conviction of assault with intent to rape. Dutton was excluded from the room in which the complaining witness gave her testimony. This, held the Court, violated art. 21 of the Declaration of Rights, because Dutton "had the constitutional right to be confronted by the witnesses...." *Id.*, 123 Md. at 389, 91 A. at 423. The Court mentions several purposes served by the right. One relates to cross-examination: the defendant could make useful suggestions during examination of the witness. Another clearly involves not only the personal presence of the accused, but the ability of the witness to observe him: "It might be that in the course of her examination in the presence of the accused the prosecuting witness would discover that she had made a mistake in the identity of the party committing the crime." *Id. See also State v. Collins*, 265 Md. 70, 79, 288 A.2d 163, 168 (1972) (presence of defendant's attorney at deposition did not satisfy defendant's art. 21 "personal right ... to be directly confronted by the witnesses against him....")

We conclude, then, that the constitutional right of confrontation ordinarily includes, among other things, the right of the accused to be seen by his accuser when the accuser is

testifying against the accused. This requirement supports the truth-seeking function of confrontation because it tends to impress upon the witness the seriousness and solemnity of the occasion, and as a consequence, the necessity for truthful testimony. The need for truthfulness is further enhanced by the witness's awareness that the accused has personal knowledge of the facts bearing on his or her involvement in the offense charged.[8]

Nevertheless, procedures like those used in these cases—procedures under which the accusing witness cannot see the accused while the witness is testifying—may under certain circumstances be permissible under the sixth amendment and art. 21 confrontation clauses. It remains to be seen whether those circumstances are present here.[9]

---

**8.** We recognize that under some circumstances the presence of the accused may intimidate the witness and thus induce untruthfulness. *See, e.g., Commonwealth v. Willis,* 716 S.W.2d at 230 (There is a difference between confrontation and intimidation); *State v. Daniels,* 484 So.2d at 944 ("The Constitution mandates confrontation, not intimidation"). But "intimidation" also may induce truthfulness, and even the universally recognized confrontational right of cross-examination can be exceedingly intimidating. Intimidation in a general sense, then, is not a reason for denying confrontation that requires the presence of the accused before the accuser. Whether a particular accuser is especially "intimidated" by the circumstances of a particular case, *see* Graham, *Indicia of Reliability and Face to Face Confrontation: Emerging Issues in Child Sexual Abuse Prosecutions,* 40 U. Miami L.Rev. 19, 74 (1985), and whether that sort of "intimidation" may excuse strict application of the confrontation clause, we shall discuss in section B, *infra.*

**9.** Section 9–102 does not, in express terms, prohibit a procedure which would permit the witness to see the defendant. It requires only that the witness and the defendant be in separate rooms while the witness is testifying. Thus, it might permit the sort of testimony by two-way closed-circuit television that was found to meet constitutional muster in *Kansas City v. McCoy,* 525 S.W.2d. 336 (Mo.1975) (en banc); and *People v. Algarin,* 129 Misc.2d 1016, 498 N.Y.S.2d 977 (N.Y.Sup.Ct. 1986). On the other hand, the titles to Chs. 495 and 499, Acts of 1985, both state as a purpose of the section that "the child's testimony be taken outside ... the physical presence of the defendant...." This may indicate an intent to prevent any view of the defendant by the witness during testimony. A contrary reading might well frustrate a goal of the statute, of which more below. In any case, the procedures

B. *Application of Section 9–102 Does Not Result in the Unconstitutional Denial of Defendants' Right of Confrontation*

As both Wildermuth and McKoy concede, the right to confrontation, fundamental as it is, is not absolute. It "must occasionally give way to considerations of public policy and the necessities of the case." *Mattox*, 156 U.S. at 243, 15 S.Ct. at 340, 39 L.Ed. at 411. *See also e.g., Ohio v. Roberts*, 448 U.S. 56, 64, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597, 606 (1980); *Moon v. State*, 300 Md. 354, 368–369, 478 A.2d 695, 701 (1984); *Collins*, 265 Md. at 77–78, 288 A.2d at 167–168.[10]

In *Ohio v. Roberts, supra,* the prosecution sought to introduce, at trial, the transcribed testimony given by a witness at a preliminary hearing. Recognizing that the confrontation clause "reflects a preference for face-to-face confrontation," *Id.*, 448 U.S. at 63, 100 S.Ct. at 2537, 65 L.Ed.2d at 607, the Supreme Court declared:

In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate

---

employed pursuant to the statute in the cases before us without doubt concealed the defendants from the witnesses.

**10.** Under some circumstances, the right may be forfeited or waived. *See, e.g., Beasley v. State,* 271 Md. 521, 533, 318 A.2d 501, 507–508 (1974); *United States v. Balano,* 618 F.2d 624, 630 (10th Cir.1979), *cert. denied,* 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980); *United States v. Carlson,* 547 F.2d 1346, 1357–1358 (8th Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977) (threats to life of witnesses may justify some restriction on cross-examination). And, disruptive behavior on the part of the defendant may justify removal from his own trial. *See Illinois v. Allen,* 397 U.S. 337, 343–344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353, 359 (1970); and *Bowers v. State,* 306 Md. 120, 128, 507 A.2d 1072, 1076 (1986).

A defendant may also waive his right to confrontation by stipulating to the admission of evidence, *Williams v. Oklahoma,* 358 U.S. 576, 584, 79 S.Ct. 421, 426, 3 L.Ed.2d 516, 521–522 (1959), or by entering a plea of guilty, *Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279 (1969). None of these circumstances, however, is presented by the records before us.

"indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.*, 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608. The Court found the transcript admissible because the witness was unavailable despite the prosecution's good faith efforts to locate her, and because the opportunity to cross-examine, and the exercise of that opportunity at the preliminary hearing, afforded the requisite indicia of reliability. *Id.*, 448 U.S. at 73–77, 100 S.Ct. at 2542–2545, 65 L.Ed.2d at 612–615. From this holding we learn that if there is sufficient necessity for not permitting the accused to confront his accuser directly (unavailability), and if the situation is such that there is some reasonable substitute for the truth-seeking confrontation requirement of physical presence (reliability), then the right of confrontation may still be satisfied.[11]

In the cases before us, there is little doubt about the "reliability" prong of the *Roberts* test. Section 9–102, as applied in these cases, provides for most of the aspects of confrontation that enhance the reliability of testimony: cross-examination, testimony under oath, ability of judge, jury, and accused to view the witness during the testimony. While a few cases have questioned the ability of television to reproduce with sufficient accuracy what would be seen in an actual physical confrontation, *see, e.g., Stores v. State,*

---

**11.** *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), teaches that in some circumstances "unavailability" is not a prerequisite to the use of hearsay. The case holds that a co-conspirator's statement, made during the progress of the conspiracy, is admissible regardless of availability. This is because special characteristics regarding that sort of statement constitute evidence which cannot be replicated by in-court testimony at trial. *Id.*, 475 U.S. at 394, 106 S.Ct. at 1126, 89 L.Ed.2d at 404–405. We do not read *Inadi* as removing the necessity requirement in cases like those before us. *But see Johnson v. State*, 292 Ark. 632, 732 S.W.2d 817 (1987); and *State v. Coy*, 397 N.W.2d at 734.

625 P.2d at 828–829, and *Hochheiser v. Superior Court,* 161 Cal.App.3d 777, 794, 208 Cal.Rptr. 273, 284 (1984), most courts that have considered the question have concluded that this modern technology is sufficient for that purpose. *See, e.g., Commonwealth v. Willis,* 716 S.W.2d at 230 ("A photographic or electronic presentation [of evidence] is not perfect as a substitute for live testimony, but it will suffice"); *State v. Melendez,* 135 Ariz. 390, 393, 661 P.2d 654, 657 (App.1983). *State v. Sheppard,* 197 N.J.Super. 411, 435, 484 A.2d 1330, 1344 (1984); *People v. Algarin,* 129 Misc.2d at 1022, 498 N.Y.S.2d at 981. The method of communication between defendants and counsel was sufficient to permit cross-examination and thus to enhance reliability. *People v. Johnson,* 146 Ill.App. at 649, 100 Ill.Dec. at 336, 497 N.E.2d at 314.

The only reliability function not substantially provided by one-way closed-circuit television is that derived from the witness's view of the accused. The question becomes whether the showing under the "necessity" prong of the test is sufficiently strong to overcome that lack. We first approach the question in a general way, looking at statutory language and background. In Section C, *infra,* we shall explore the specific application of the "necessity" factor to Wildermuth's case.

■ The problem of child abuse, and particularly sexual child abuse, is one that appears to many to be of epidemic proportions. *See generally,* Libai, *The Protection of the Child Victim of a Sexual Offense in the Criminal Justice System,* 15 Wayne L.Rev. 977 (1969). Among the troubling aspects of this epidemic are reluctances to report offenses, difficulties in investigating them, and obstacles to prosecuting them. A major obstacle to prosecution is the fact that the alleged child victim is often the principal witness for the prosecution, and young children often find it extraordinarily difficult to testify about sexual abuse, especially when the alleged abuser may be a relative. Moreover, to force a child to give this sort of testimony, in open court, in the presence of the accused, may further traumatize the child.

Note, *The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations*, 98 Harv.L.Rev. 806, 807 (1985); Note, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases*, 83 Colum.L.Rev. 1745, 1746 (1983).

In Maryland, the Governor's Task Force on Child Abuse in its *Interim Report* (Nov. 1984) documented the existence of the problem in our State. *Interim Report* at 1. It brought the picture up to date in its *Final Report* (Dec. 1985). In the first six months of 1985, investigations of child abuse were 12 percent more numerous than during the same period of 1984. In 1979 4,615 cases of child abuse were investigated; in 1984, 8,321. *Final Report* at iii. In its *Interim Report* at 2, the Commission proposed legislation that, with some changes, became § 9–102. The proposal was "aimed at alleviating the trauma to a child victim in the courtroom atmosphere by allowing the child's testimony to be obtained outside of the courtroom." *Id.*, at 2. This would both protect the child and enhance the public interest by encouraging effective prosecution of the alleged abuser.

Maryland was not alone in seeking a solution to one aspect of the child abuse problem through statutory (or court rule) authorization for closed-circuit television testimony or, in some cases, videotaped depositions. Professor Michael H. Graham reports that by March of 1985, 16 states had enacted statutes authorizing closed-circuit television testimony in child abuse cases and 25 states (some of them the same) had provided for videotape depositions in such cases. *See* Graham, *Child Sexual Abuse Prosecutions: The Current State of the Art*, 40 U. Miami L.Rev. 1, 7–8 n. 10 (1985). These states have been responding to what they see as a serious problem by taking steps to protect the child victim of sexual abuse. The need for some remedy in this area is widely perceived and courts have looked to this perception in undertaking the necessary analysis.[12] *War-*

---

**12.** The use of closed-circuit television testimony and videotaped depositions are not, of course, the only remedies for this problem. On a

*ford,* 223 Neb. at 374, 389 N.W.2d at 580; *Sheppard,* 197 N.J.Super. at 419–423, 484 A.2d at 1334–1337; *Algarin,* 129 Misc.2d 1023–1024, 498 N.Y.S.2d at 982.

One of the aims of the remedial measures, including § 9–102, is to safeguard the physical and psychological well-being of child victims by avoiding, or at least minimizing, the emotional trauma produced by testifying. The "protection of minor victims of sex crimes from further trauma and embarrassment" is a compelling government interest. *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248, 257–258 (1982). But in the confrontation context, something different from a general compelling interest must be shown. The need (unavailability) must be specific to the particular witness whose testimony is sought:

> [T]here can be no more justification for excusing all child victims from testifying than for imposing the duty on all of them. Each case merits its own individual decision.

Libai, *The Protection of the Child Victim of a Sexual Offense in the Criminal Justice System,* 15 Wayne L.Rev. at 1009. Thus, in *People v. Algarin,* which involved 15 alleged victims, the trial court found only three sufficiently "vulnerable" to justify use of New York's closed-circuit

---

. proper showing of compelling public interest, a courtroom may be closed. If a child witness's psychological problem has to do with testifying before a large number of strangers (courtroom spectators), the courtroom could be closed, if the facts were sufficiently strong to warrant that drastic action. *See Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (court closure to protect witness permissible, but decision must be on case-by-case basis, considering various factors). *See also Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); *Buzbee v. Journal Newspapers, Inc.,* 297 Md. 68, 465 A.2d 426 (1983); *Baltimore Radio Show v. State,* 193 Md. 300, 67 A.2d 497 (1949), *cert. denied,* 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950); *Journal Newspapers, Inc. v. State,* 54 Md.App. 98, 456 A.2d 963 (1983); *Erman v. State,* 49 Md.App. 605, 434 A.2d 1030 (1981); *Patuxent Publishing Corporation v. State,* 48 Md.App. 689, 429 A.2d 554 (1981).

television procedures. *Id.,* 129 Misc.2d at 1018–1019 n. 4, 498 N.Y.S.2d at 979–980 n. 4.

The Maryland legislature recognized this requirement of specific determination of need or unavailability. Before the protective procedures of § 9–102 may be invoked, the judge must determine "that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." Section 9–102(a)(1)(ii). The provision effectively defines "serious emotional distress" as a condition under which "the child cannot reasonably communicate." A finding to that effect is tantamount to a finding of unavailability in the *Roberts* sense, and meets the necessity prong of the *Roberts* test. *Commonwealth v. Willis,* 716 S.W.2d at 230; *People v. Johnson,* 146 Ill.App.3d at 646, 100 Ill.Dec. at 334, 497 N.E.2d at 312 (child witness who is physically present is nevertheless "unavailable" for confrontation purposes if psychologically unable to testify). *And see Long v. State,* 694 S.W.2d 185 (Tex.Ct.App.1985), *aff'd en banc,* No. 867–85 (Tex.Crim.App.) (July 1, 1987) ("Unquestionably in specific cases a compelling state interest will exist to a degree sufficient to create a necessity that requires a diminution of a defendant's right of confrontation. But this necessity must be the practical equivalent of a witness's unavailability"). *See also* 40 U. Miami L.Rev., *supra,* at 92.

The Maryland statute, indeed, is similar to (but stricter than) the provisions sustained against confrontation clause attack in *State v. Vigil,* 103 N.M. 583, 711 P.2d 28 (App. 1985). Under the provisions involved there, (N.M.Stat.Ann. § 30–9–17 (1978, Repl.Pamp.1984) and N.M.Stat.Ann.Crim. Proc. Rule 29.1 (1978, Repl.Pamp. 1985)) the court could permit use of a videotape deposition upon a "showing that the child may be unable to testify without suffering unreasonable and unnecessary mental or emotional harm." *Id.,* 103 N.M. at 585, 711 P.2d at 30. *Compare* with the New York law applied and upheld in *Algarin* (N.Y.Crim.Proc.Law, art. 65, § 65.00 *et seq.* (Consol.1985), allowing the

court to declare a child witness "vulnerable" when the court "determines from its own observation that a child witness who has been called to testify at a criminal proceeding is suffering severe mental or emotional harm and is therefore physically or mentally unable to testify.") *Id.* § 65.10.(1).

■ The degree of confrontation allowed by § 9–102, then, satisfies the constitutional requirements if there is compliance with subsection (a)(1)(ii) as a condition precedent to application of the statute. The statute is valid as against the general confrontation clause attacks mounted by Wildermuth and McKoy.

So far as McKoy is concerned, that ends the confrontation matter. Although in his brief he argues that "the record does not support a finding that the state's interest in protecting the child against trauma could in fact be furthered by removing her from the courtroom," at trial he conceded that he was not opposing the use of closed circuit television on the ground that the prerequisite conditions had not been established. Since he did not contest the existence of the predicate condition below, that issue is not before us. Md.Rule 885. Wildermuth, however, did raise the issue. We turn now to the question of whether the evidence before Judge Williams in Wildermuth's case was sufficient to support his subsection (a)(1)(ii) finding.

C. *The Finding of "Unavailability" in Wildermuth's Case*

■ We have pointed out that the type of confrontation permitted by § 9–102 can be constitutionally justified only if the prerequisites of *Ohio v. Roberts, supra,* are met. One of those prerequisites is a showing of witness unavailability—that is, a degree of necessity that supports use of a procedure (or the sort of evidence) that would otherwise not satisfy the confrontation requirements. As we have explained, we are persuaded that if testimony in open court will indeed "result in the child [witness] suffering serious emotional distress" as that phrase is statutorily defined, there is sufficient unavailability. The question we now

consider is whether Judge Williams properly found the existence of that condition.

Wildermuth's case was called for trial on 24 July 1986. As soon as the assistant state's attorney had done that, he moved to invoke § 9–102. In support·of this motion, he called two expert witnesses. The first was Janice Thompson, who had been a "counselor psychologist" for "[a]bout three and a half years."

Ms. Thompson had met with the nine-year-old child involved in the case on several prior occasions. She described the child as "shy" but "communicative." When asked to state her opinion "as to what [the child's] emotional state and ability to communicate would be if she [the child] were called upon to testify about these things in court today in front of a jury of twelve adults that she never had met before, in the presence of her father, lawyer[s] and other ... court personnel," Ms. Thompson replied: "I believe that she would be fairly intimidated by the large number of strangers." A bit later the following exchange occurred:

[Ms. Thompson] I believe it's very difficult for a child to stand before both parents and to say anything against either parent.... They can talk ... to an objective other person much easier than when the parents are there.

Q. (By Mr. Caroom [Assistant State's Attorney]): Okay. You ... your answer just now was in terms of any child.

A. Yes.

Q. Now specifically as to [the child witness] with her personality and emotional state that we've discussed, what would your opinion be as to [her]?

A. The same.

Q. And would she ... have it better or worse than any—any other average child would you say under these circumstances?

An objection to the last question was sustained and direct examination by the State ended. On cross-examination Ms. Thompson opined that testimony in open court would be "a

very frightening experience" for the child and that "it would be almost impossible for her to answer questions in front [of] such a large group of people whom she does not know." She thought, however, that the child would tell the truth. Asked whether the child "could not ... or would not respond" to questions in the courtroom, she "could not be sure of that." And she agreed that any nine-year-old child would have similar difficulties in responding to questions in court.

The next witness was Robin Davenport, Director of the Victim/Witness Assistance Center in the Anne Arundel County State's Attorney's Office. Ms. Davenport, who had worked as a social worker and held a Bachelor's degree in counseling, was a veteran of five and a half years service in the Victim/Witness Assistance Center. She had had extensive experience in counseling children from "different emotional and psychological backgrounds." She had met four or five times with the potential child witness.

Ms. Davenport thought the child

has, uhm, an extremely difficult time communicating, uhm, about—about things that seem to be emotionally traumatic for her, particularly for her age.... [F]or a nine-year old she is really having a very, very difficult time verbalizing the—the things that—that are relevant to this case.

In response to another question she added:

My opinion is that [the child] probably would not be able to answer questions that—that were emotion—that—that answers were emotionally traumatic to her. I—I don't believe she'd be able to do it faced with all these people, and specifically in front of her father.

On cross-examination, Ms. Davenport explained that the child "would be intimidated ... as many children are in alleged sexual abuse cases...."

After hearing argument Judge Williams found that the child

is reticent and unable to verbalize in certain situations. And I think both witnesses have indicated that she would be under serious emotional distress were she required to testify in open court in front of the jury and her father and assorted other court personnel and would not be able to communicate.

He granted the State's motion.

We can appreciate the judge's sympathy with the potential child witness, but we cannot deduce from the testimony we have summarized anything that would support a finding that the testimony in open court "will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." The statute sets a difficult standard, as it should, when dealing with matters involving the constitutional rights of a presumptively innocent defendant.

■■ Ms. Thompson's testimony related chiefly to young children in general, and at the most suggested that the child (or any child) would find it "hard to respond at all in the courtroom." But "hard to respond" does not come close to "serious emotional distress such that the child cannot reasonably communicate." Ms. Davenport's testimony was more specific, indicating some degree of intimidation and a greater likelihood of inability to respond. But she, too, spoke to some extent in terms of all children as a group. As we have already explained, what is essential to meet the demands of the *Roberts's* "unavailability" or "necessity" requirement (as well as the § 9–102(a)(1)(ii) predicate) is a specific demonstration that the particular child witness concerned crosses the high statutory threshold. *Warford,* 223 Neb. at 376–377, 389 N.W.2d at 581 ("There should be a particularized showing on the record that the child would be further traumatized or was intimidated by testifying in the courtroom as in front of the defendant"). *Long v. State, supra, and see Hochheiser,* 161 Cal.App.3d at 793, 208 Cal.Rptr. at 283. That did not happen here. Moreover, Judge Williams never questioned or even observed the child witness before he made his ruling. While personal observa-

tion by the judge may not be a *sine qua non* under § 9–102, it should be the rule rather than the exception. *See Hughes v. Arkansas*, 292 Ark. 619, 732 S.W.2d 829 (1987).

On the one hand, a judge's subjective and self-justifying recollections of a child's demeanor, absent support in the record, will not be enough to justify a finding that limits the right of confrontations. *Herbert*, 117 Cal.App.2d at 670, 172 Cal.Rptr. at 855. On the other hand, expert testimony may not be essential to establish the necessary predicate. *Washington v. State*, 452 So.2d 82, 83 (Fla.Dist.Ct.App. 1984). For example, the testimony of a parent may be sufficient, when combined with the child's own testimony and judicial observation of the child. *State v. Cooper*, 291 S.C. 351, 353 S.E.2d 451, 456 (1987). The statute involved in *Algarin* required the court to use "its own observations" and the court did. *Id.*, 129 Misc.2d at 1018–1019, 498 N.Y.S.2d at 979. *See also Vigil*, 103 N.M. at 585–586, 711 P.2d at 30–31.

We shall not attempt to list all the possible ways in which evidence may meet the standard or all the ways in which it may fall short. We repeat, however, that ordinarily the judge should observe and question the child.[13] Additionally, testimony about the likely impact on the particular child must be specific and must show much more than mere nervousness or excitement or some reluctance to testify. *Long, supra.* While the testimony need not be given in the precise words of the statute, it must be clear that the statutory requirements are met in substance. *Raithel v. State*, 280 Md. 291, 303, 372 A.2d 1069, 1072 (1977). Testimony about the likely impact on the child testifying must be definite, related to the statutory standard, and specific to the potential child witness him or herself. As the court said

---

13. In McKoy's case the judge observed the child while she was questioned. At an early stage of the questioning, the child apparently began to cry and stopped responding to questions. This may have caused defense counsel to conclude that the § 9–102(a)(1)(ii) standard had been met, and thus produced his concession to that effect. *See* pp. 503 and 520, *supra.*

in *Algarin*, there must be "a particularized examination of all the circumstances concerning the impact of public testimony in the presence of the defendant upon the emotional health of the child." *Id.*, 129 Misc.2d at 1024, 498 N.Y.S.2d at 983.

The evidence in Wildermuth's case was not enough. We must reverse Wildermuth's conviction and remand for further proceedings. In the interest of judicial economy, however, we shall address the remaining issues Wildermuth raises, since they may arise at a new trial. We shall then take up the other issues posed by McKoy.

## II.  *Wildermuth's Remaining Issues*

### A.  *Section 9–102 and the Right to Counsel*

■ Wildermuth points out that § 9–102(c) makes the section inapplicable "if the defendant is an attorney *pro se*." That is, if the defendant represents himself, § 9–102 cannot be used to implement the closed-circuit television procedure; the *pro se* defendant will be able to confront the witness in the fullest sense of the word. According to Wildermuth, this forces the defendant to choose between his constitutional right to counsel and his constitutional right to counsel and his constitutional right to confrontation. The choice, he says, "penalizes the exercise of [his right to counsel]" and is therefore unconstitutional. We find this contention to be without merit.

Appellant Wildermuth correctly asserts that the compulsory election between two constitutional rights, in effect, amounts to the denial of a constitutional right. This principle was enunciated in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968):

> ... Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim, or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.

*Id.,* 390 U.S. at 394, 88 S.Ct. at 976, 19 L.Ed.2d at 1259. *See Long, supra.* The fallacy of Wildermuth's argument, as advanced in this case, is that § 9–102 does not require anyone to give up one constitutional right in order to assert another. As we have demonstrated, if the statute is properly applied, there is no unconstitutional denial of the right to confrontation. Thus, a counseled defendant is not deprived of this right, although his exercise of it will be in a manner different from that of the *pro se* defendant. In one case, the defendant will not be in view of the witness; in the other, the defendant will. But there is no choice between constitutional rights. Thus, we decline to reverse *Wildermuth's* conviction on this basis.

B. *Can § 9–102 Be Invoked on a Charge of Third Degree Sexual Offense?*

■ Wildermuth was tried for and convicted of child abuse (art. 27, § 35A) and third degree sexual offense (art. 27, § 464B). He argues that the § 9–102 procedure is available only with respect to the former offense. Therefore, he asserts his conviction of third degree sexual offense must be reversed. We disagree.

Section 9–102(a)(1) tells us that "[i]n a case of abuse of a child as defined in § 5–901 of the Family Law Article or article 27, § 35A of the Code, a court may order that the testimony of a child victim be taken outside the courtroom and shown in the courtroom by means of closed circuit television if ..." certain conditions are met. As this language suggests, the two referenced sections contain definitions. The definitions are virtually identical. The relevant ones are those of "child" (art. 27, § 35A (b)2, Fam. Law § 5–901(c)); "abuse" (art. 27, § 35A (b)7, Fam. Law § 5–901(b)); and "sexual abuse" (art. 27, § 35A (b)8, Fam. Law § 5–901(j)). The last is particularly pertinent, and we quote it from the Family Law Article:

(1) "Sexual abuse" means any act that involves sexual molestation or exploitation of a child by a parent or other

person who has permanent or temporary care or custody or responsibility for supervision of a child.

(2) "Sexual abuse" includes:

(1) incest, rape, or sexual offense in any degree;

(ii) sodomy; and

(iii) unnatural or perverted sexual practice.

Section 9–102(a)(1) explains in plain language that the closed-circuit television procedure may be available whenever a person is charged with an offense that includes acts within the definitions of "abuse of a child" as contained in the two sections referred to. There is nothing in the language of § 9–102(a) that limits its application to a charge of violation of art. 27, § 35A. Had that been the legislative intent, it would have been expressed quite differently and there would have been no need to mention Family Law Article § 5–901.

The language of a statute should be read in the context of the goal the legislature was seeking to achieve. *Kaczorowski v. City of Baltimore*, 309 Md. 505, 514, 525 A.2d 628, 633 (1987). In Part I of this opinion, we have discussed the legislative goal of § 9–102—to protect child victims of sex abuse from trauma caused by requiring them to testify in open court. That purpose is inconsistent with the grudging reading of the statute proposed by Wildermuth. It is consistent with our reading of the provision, for there is nothing in the legislative history to suggest that the legislature would have wished to protect children who were victims of art. 27 § 35A offenses, but not to protect those who were the victims of other sorts of child abuse. *See* the discussion at pp. 516–517, *supra.* Section 35A, like Family Law Article § 5–901, includes "sexual offense in any degree" in its definition of "sexual abuse." A third degree sexual offense is a "sexual offense in any degree" and thus is defined by both the reference sections. *Id.* Wildermuth's statutory construction argument is without merit.

This completes our review of Wildermuth's case. We now proceed to McKoy's remaining contentions.

### III. *McKoy's Remaining Issues*

### A. *Right to be Present*

In addition to his right of confrontation argument, McKoy asserts that use of the § 9–102 procedure denied him the right to be present at all critical stages of his trial. In Maryland, "a criminal defendant's right to be present at every stage of his trial is a common law right, is to some extent protected by the Fourteenth Amendment to the United States Constitution, and is guaranteed by Maryland Rule 724...." [14] *Williams v. State*, 292 Md. 201, 211, 438 A.2d 1301, 1306 (1981). To some degree the right of confrontation and the right to be present may overlap, but the latter extends beyond the former in certain respects. For example, examination of jurors on voir dire does not involve a confrontation between accused and accusers. Nevertheless, it is a critical stage of the trial, and absent waiver, the defendant is entitled to be present at it. *Williams, supra*, 292 Md. at 211, 438 A.2d at 1306; and *Brown v. State*, 272 Md. 450, 456, 325 A.2d 557, 560 (1974). *See also United States v. Gagnon*, 470 U.S. 522, 527, 105 S.Ct. 1482, 1485, 84 L.Ed.2d 486, 491 (1985).

In McKoy's case there is no question of waiver of the right to be present, nor is there any doubt that the child witness's testimony was a critical stage of his trial. The only issue is whether use of closed-circuit television, as described previously, deprived McKoy of the right. We hold that it did not.

With respect to the fourteenth amendment, the right to be present that we now consider applies only when the defendant's presence has a reasonably substantial relationship to the fullness of the opportunity to defend; that is, the defendant's presence must in some way contribute to the fairness of the hearing. *Kentucky v. Stincer*, 482 U.S. ——, ——, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631, 647 (1987). *Gagnon*, 470 U.S. at 526, 105 S.Ct. at 1484, 84 L.Ed.2d at

---

**14.** Now Rule 4–231.

490. As Justice Cardoza once explained: "So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Snyder v. Massachusetts,* 291 U.S. 97, 107–108, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679 (1934). *See also Hughes v. State,* 288 Md. 216, 224, 421 A.2d 69, 74 (1980).

McKoy notes cases, such as *Bunch v. State,* 281 Md. 680, 381 A.2d 1142 (1978), in which the accused's right to be present was held to have been denied even when he was in the courtroom where certain proceedings took place. From this premise he argues that his right to be present was denied because the witness testified in a separate room, in which he was not permitted. But *Bunch* and similar cases involved bench conferences, from which defendants were excluded. They could not hear what was taking place at the bench conferences and had no effective way of participating in them. That is not the situation here. McKoy could see the witness as she testified, could hear the questions asked of her and her responses, and could communicate with his lawyer in order to convey information or suggest questions to ask. The statutory procedure did not thwart a fair and just hearing in terms of due process. Thus, there was no violation of McKoy's due process right to be present.

As to the Maryland common law right to be present, the legislature can change the common law. *See Jones v. State,* 303 Md. 323, 337 n. 10, 493 A.2d 1062, 1069 n. 10 (1985); *Pope v. State,* 284 Md. 309, 341, 396 A.2d 1054, 1073 (1979). If § 9–102 narrows the common law right to be present, this was an alteration the General Assembly was entitled to make.

B. *Presumption of Innocence and Due Process*

■ McKoy next claims that § 9–102 deprives him of his presumption of innocence and hence of due process. The thrust of the argument, which is unsupported by citation of

authority, is that the use of an extraordinary procedure, such as testimony by closed-circuit television, suggests to the jury that the defendant is guilty. As McKoy puts it, "[i]t is the affirmative taking of precautions for apparent protective reasons that suggests a previous determination of the defendant's culpability." This prejudice was exacerbated, according to McKoy, because the reasons for invoking § 9–102 were made known to the jury.

As to the second part of this submission, it is factually incorrect. At argument before us, McKoy's appellate counsel (who was not trial counsel) so conceded. Thus, there is no indication that the jury heard any discussion about application of the statute, or any mention of the fact that the child witness was allegedly intimidated by the defendant's presence.

Nor do we think that the use of the closed-circuit television necessarily suggests anything about a defendant's culpability. The jury was instructed not to give the televised testimony any greater or lesser weight than if it had been given in the courtroom. It might well have assumed that televising a child's testimony was simply a procedure used to reduce the trauma any child might suffer through public testimony. We are not persuaded that this procedure tended to brand McKoy as guilty. The Supreme Court of Iowa reached the same conclusion (with respect to use of an analogous screening procedure) in *State v. Coy*, 397 N.W.2d at 735. Accordingly, we reject this contention.

### C. *An Evidentiary Issue*

During trial the prosecution questioned Daphne Bolden, the woman with whom McKoy was living and the mother of the alleged child victim. Ms. Bolden was asked

Q. So, Daphne, do you remember telling [your sister] Melanie about this case? If [the child] ... kept her mouth shut this long why couldn't she keep it shut.

A. No, I never said that....

Defense counsel objected, moving to strike, and for a mistrial. After lengthy argument the motions were denied.

The question was asked again and Ms. Bolden replied "No, I don't remember saying that to her."

McKoy says Ms. Bolden's "comment" somehow showed her belief that she accepted the child's story and that she believed he was guilty. But, he continues, her beliefs were irrelevant, and thus inadmissible. The State says the question was an attempt to establish Ms. Bolden's bias because it tended to show that she didn't want McKoy to be charged.

Which one is legally correct we need not say. The short of it is that Ms. Bolden effectively denied making the statement. The State produced no evidence that she had made it. After the exchanges we have recounted, the matter was dropped. We cannot see how this trivial exchange could in any way have prejudiced McKoy. If there was error, it was harmless beyond a reasonable doubt. *Dorsey v. State*, 276 Md. 638, 648–661, 350 A.2d 665, 671–679 (1976).

JUDGMENT IN NO. 2 (ADV.), SEPT. TERM, 1987 (WILDERMUTH) REVERSED. CASE REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.

JUDGMENT IN NO. 7 (ADV.), SEPT. TERM, 1987 (MCKOY) AFFIRMED. COSTS TO BE PAID BY APPELLANT.